*E-FILED - 12/22/08*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| AMERICO VARGAS, | ) | No. C 07-1079 RMW (PR) |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION FOR |
| | ) | WRIT OF HABEAS CORPUS |
| vs. | ) | |
| | ) | |
| PLEASANT VALLEY STATE PRISON, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

     Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the petition should not be granted.  Respondent has filed an answer addressing the merits of the petition, and petitioner has filed a traverse.  Having reviewed the briefs and the underlying record, the court concludes that petitioner is not entitled to relief based on the claims presented and denies the petition.

**BACKGROUND**[1]

     The prosecution's evidence demonstrated that on February 9, 2004, petitioner attacked

---

[1]  All facts are taken from the California Court of Appeal opinion, a copy of which is located in Respondent's Answer to Order to Show Cause, Exhibit C (People v. Vargas, California Court of Appeal, Sixth Appellate District, Case No. H028844, July 21, 2006).

the victim, Terria Artiga, with a screwdriver, impaling her chest, arm, and leg, requiring

hospitalization for three days.  Of the victim's 18 scrapes and stab wounds, the most serious one

punctured her lung.  Petitioner's defense was that one of the neighbors attacked petitioner and

the victim was injured when she tried to separate the two men and protect petitioner.

As background, the prosecution's evidence showed that petitioner and the victim dated,

had two children together, and lived together for approximately seven years.  During that time,

they never married, and petitioner never divorced his wife.  At trial, the victim testified that

petitioner was "verbally abusive" for years.  At one time, petitioner struck her because he

believed she was having an affair.  When the victim observed that her daughter was scared, she

"knew [she] had to go," so she and her children moved from Fresno to San Jose to live with

family members.

On the day she was stabbed, the victim was on her way to her grandmother's house with

her daughters and stopped to talk to a neighbor, John Lopez.  At that time, petitioner pulled up as

a passenger in another car and the victim drove around the corner to talk to him because she

"knew that he was upset."  Petitioner got into the victim's van after she agreed to drive him to

his niece's apartment.  As they drove, they argued and petitioner accused her of "messing

around" with Lopez.  By the time they reached their destination, they were yelling at each other

and one of the daughters began crying in the back seat.  After the victim refused to go into the

apartment with petitioner, he grabbed the victim's car keys, but threw them back into the car

once the victim stated that she was going to find someone to call the police.  When the victim

pulled into a driveway where a woman was on the phone and asked the woman to call the police,

petitioner jumped out of the van and threatened the victim.

When the victim arrived back at her grandmother's house, her grandmother and aunt

were in the driveway.  Petitioner approached and said that he had the victim's driver's license

and he wanted to return it to her.  The victim attempted to run, but petitioner grabbed her and

began to hit her once she had fallen onto the driveway floor.

At least three people, including the victim, the victim's uncle, and Lopez, testified that

petitioner was on top of the victim hitting her.  At first, the victim's uncle got petitioner off of

1  the victim and hit him several times.  Then, Lopez arrived and hit petitioner again.  By the time

2  Officer Biskup arrived, at least two people were trying to keep petitioner on the ground.  Officer

3  Biskup testified that he heard several people saying "he stabbed her . . . with a screwdriver."

4       Both the victim and petitioner needed treatment at the hospital.  While at the hospital,

5  petitioner explained to Officer Wellman that he and the victim recently broke up and were

6  arguing.  Petitioner told Officer Wellman that he had taken a screwdriver from his toolbox and

7  walked to the victim's grandmother's house.  Petitioner also told him that he believed the victim

8  was dating Lopez, and when he saw Lopez, whom he believed to be the victim's new boyfriend,

9  he "just snapped" and went after Lopez because he was angry.  Petitioner told Officer Wellman

10 that the victim tried to stop him and Lopez from fighting and must have gotten caught in between

11 them.  Petitioner also told Officer Wellman that Lopez picked up the screwdriver that petitioner

12 had dropped and stabbed petitioner in the head.

13      At trial, petitioner testified that he thought Lopez did not like him because of something

14 that had happened between them in the past.  Petitioner also testified that when he saw the victim

15 around the corner of her grandmother's house, the victim was upset because petitioner had

16 caught her "in front of a drug house."  Petitioner further testified that they argued about the fact

17 that the victim had kept their relationship a secret from her family.  Petitioner said that he

18 realized he had taken the victim's driver's license after she drove off, so he walked to her

19 grandmother's house where he saw the victim, her aunt, her grandmother, her uncle, and Lopez.

20 Petitioner testified that the men assaulted him and he grabbed a screwdriver out of the victim's

21 van.  Petitioner also testified that Lopez hit him, causing him to drop the screwdriver.  Lopez

22 picked up the screwdriver and the victim kept getting in the way in order to protect petitioner.

23 Petitioner also stated that he was not interviewed by Officer Wellman and that Wellman had lied.

24      After closing arguments, the jury took less than three hours to deliberate before returning

25 guilty verdicts for attempted premeditated murder, infliction of corporal injury, and assault with

26 a deadly weapon.  The jury also found true enhancements that alleged the personal use of a

27 deadly weapon and the personal infliction of great bodily injury under domestic violence

28 circumstances.  After the trial court found true allegations concerning prior convictions, it

1    sentenced petitioner to 25-years to life, consecutive to a 15-year determinate term.

2        On July 21, 2006, the California Court of Appeal affirmed petitioner's convictions.  On

3    September 27, 2006, the California Supreme Court denied review.  On February 22, 2007, the

4    petitioner filed the underlying federal habeas petition.

5                                              **DISCUSSION**

6    **A.  Standard of Review**

7        This court may entertain a petition for writ of habeas corpus "in behalf of a person in

8    custody pursuant to the judgment of a state court only on the ground that he is in custody in

9    violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

10   Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

11   may not grant a petition challenging a state conviction or sentence on the basis of a claim that

12   was reviewed on the merits in state court unless the state court's adjudication of the claim

13   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

14   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

15   resulted in a decision that was based on an unreasonable determination of the facts in light of the

16   evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  The first prong applies

17   both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S.

18   362, 384-86 (2000), while the second prong applies to decisions based on factual determinations,

19   Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

20       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

21   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

22   law or if the state court decides a case differently than [the] Court has on a set of materially

23   indistinguishable facts."  Williams, 529 U.S. at 412-13.  A state court decision is an

24   "unreasonable application of" Supreme Court authority, falling under the second clause of

25   § 2254(d)(1), if the state court correctly identifies the governing legal principle from the

26   Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

27   case."  Id. at 413.  The federal court on habeas review may not issue the writ "simply because

28   that court concludes in its independent judgment that the relevant state-court decision applied

1  clearly established federal law erroneously or incorrectly." Id. at 411.

2  Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination

3  will not be overturned on factual grounds unless objectively unreasonable in light of the

4  evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.  The court must

5  presume correct any determination of a factual issue made by a state court unless the petitioner

6  rebuts the presumption of correctness by clear and convincing evidence. See 28 U.S.C. §

7  2254(e)(1).

8  In determining whether the state court's decision is contrary to, or involved an

9  unreasonable application of, clearly established federal law, a federal court looks to the decision

10  of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

11  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here, that state court is the

12  California Court of Appeal.

13  **B.    Petitioner's Claims**

14  1.    Marsden motion

15  Petitioner claims that he requested a hearing to substitute counsel and the trial court's

16  failure to hold a Marsden[2] hearing violated his Sixth Amendment right to counsel.  (Petition at

17  6.)

18  On March 15, 2004, after petitioner's arraignment, but prior to his preliminary hearing,

19  petitioner submitted a Marsden motion indicating that he was dissatisfied with the Public

20  Defenders' Office because it had "switched lawyers on me several times and has not given me

21  any consistent representation."  Petitioner also claimed, "I have attempted to present papers and

22  evidence to your honor, my attorney has taken the paper[s] and refused to present them to you."

23  Petitioner did not name any specific lawyer in his motion.  It appears from the record that several

24  public defenders had requested and obtained continuances, waiving petitioner's speedy trial

25  rights.  On April 5, 2004, petitioner appeared before the court, represented by Deputy Public

26  Defender Ashu Kalra.  Counsel Kalra waived time to conduct further investigation, and then

27

28  [2] People v. Marsden, 2 Cal. 3d 118 (1970).

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.Rmw\HC.07\Vargas079den.wpd      5

1   appeared again approximately three weeks later on May 10, 2004.  Finally on May 25, 2004,

2   Kalra appeared with petitioner for the preliminary hearing and continued to represent petitioner

3   throughout trial.  At no time did the trial court address petitioner's <u>Marsden</u> motion, nor did

4   petitioner raise the issue again.

5         The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment

6   right to counsel and is properly considered in federal habeas.  <u>Bland v. California Dep't of</u>

7   <u>Corrections</u>, 20 F.3d 1469, 1475 (9th Cir. 1994), <u>overruled on other grounds by</u> <u>Schell v. Witek</u>,

8   218 F.3d 1017 (9th Cir. 2000) (en banc).  The Ninth Circuit has held that when a defendant

9   voices a seemingly substantial complaint about counsel, the trial judge should make a thorough

10  inquiry into the reasons for the defendant's dissatisfaction.  <u>Id.</u> at 1475-76.

11        Regardless of whether the state court failed to rule on the motion to substitute counsel or

12  denied the motion, the ultimate inquiry in a federal habeas proceeding is whether the petitioner's

13  Sixth Amendment right to counsel was violated.  <u>See</u> <u>Schell</u>, 218 F.3d at 1026.  That is, the

14  habeas court considers whether the trial court's denial of or failure to rule on the motion

15  "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and

16  his attorney had become so great that it resulted in a total lack of communication or other

17  significant impediment that resulted in turn in an attorney-client relationship that fell short of

18  that required by the Sixth Amendment."  <u>Id.</u> at 1026.  Generally, the denial of, or failure to rule

19  on, a motion to substitute counsel should be analyzed as a non-structural constitutional error, i.e.,

20  the harmless error standard.  <u>Id.</u> at 1027-28.

21        The state appellate court rejected this claim.  (Resp. Ex. E, Appendix A, p. 10-15.)

22  Although the state court concluded that the trial court erred by failing to hold a <u>Marsden</u> hearing,

23  it also found that the error was harmless.

24              We consider the record as a whole as showing that appellant was not
            prejudiced by the failure of the court to have a hearing on his written

25              complaints.  Appellant's written <u>Marsden</u> motion was received by the court
            after his arraignment but before he entered a plea or had a preliminary

26              examination.  Thereafter, and once he appeared with Kalra, appellant made no
            further motions, did not object to the time waiver for further investigation, and

27              did not request appointment of another lawyer despite numerous opportunities
            to do so during the next 13 months, including a conference with the court at

28              which the prosecutor was not present and a length, emotional statement to the

court at his <u>Romero</u> motion.  Thus, we have here to review a record not just of a vague expression of dissatisfaction with one particular attorney and the trial court's rejection of it without giving the defendant a chance to elaborate, but appellant's specific, written complaints early on in the proceedings about unnamed, multiple counsel with no indication that those complaints were directed at Kalra.  We also have a record over a year of court appearances of vigorous representation by Kalra and no suggestion from appellant, once Kalra appeared with him, of any dissatisfaction.  Appellant may not have thought about renewing his <u>Marsden</u> motion to preserve the issue for appeal, but the fact that he no longer complained about his representation once he started appearing with Kalra, when he was clearly knowledgeable about the procedure for doing so, is an indication that his issues with the Public Defenders Office had been resolved.  We are satisfied that this record provides a sufficient basis for determining that the trial court's failure to conduct a hearing on appellant's written <u>Marsden</u> motion was harmless beyond a reasonable doubt.

(<u>Id.</u>, p. 14-15.)

Even assuming trial court error in failing to rule on the <u>Marsden</u> motion, a review of the record and the pleadings indicate that petitioner fails to present any facts or argument demonstrating that he suffered any harm from such error.  That is, petitioner fails to demonstrate that there was *any* conflict between himself and attorney Kalra, much less an irreconcilable one, that had become so great that it resulted in a total lack of communication or other significant impediment creating an attorney-client relationship that fell short of that required by the Sixth Amendment.  <u>See</u> <u>Schell</u>, 218 F.3d at 1026.  Nor is there any indication or assertion that the representation provided by counsel was ineffective or that petitioner was dissatisfied once Kalra began representation of him.  In fact, petitioner's habeas petition and traverse merely complain that the trial court failed to inquire into his reasons for wanting substitute counsel but do not allege that he was prejudiced by such error, that communications with counsel Kalra disintegrated, or that he suffered an irreconcilable conflict with counsel as a result.  <u>See</u> <u>id.</u> at 1026-27.

Based upon a review of the underlying record, the court finds that the state appellate court's rejection of petitioner's <u>Marsden</u> claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  <u>See</u> 28 U.S.C. § 2254(d)(1), (2).  Accordingly, petitioner is not entitled to habeas relief on this claim.

1        2.   <u>Ineffective assistance of counsel</u>

2   Petitioner claims that counsel was ineffective because he failed to make an objection on

3   the basis of relevance to testimony from the victim regarding petitioner's alleged infidelities and

4   his collection of photographs of naked women.  (Petition at 6.)

5   At trial, the prosecutor questioned the victim regarding petitioner's faithfulness and the

6   general state of their relationship.  In response to such questioning, the victim mentioned that

7   after their first child was born, she discovered photographs with dates on them of petitioner

8   "hugging on" other naked women (RT 250-51).  Defense counsel objected on the basis of a lack

9   of foundation, and the trial court overruled the objection.

10   A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

11   Amendment right to counsel, which guarantees not only assistance, but effective assistance of

12   counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  The benchmark for judging any

13   claim of ineffectiveness must be whether counsel's conduct so undermined the proper

14   functioning of the adversarial process that the trial cannot be relied upon as having produced a

15   just result.  <u>Id.</u>

16   In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

17   must establish two things.  First, he must establish that counsel's performance was deficient, i.e.,

18   that it fell below an "objective standard of reasonableness" under prevailing professional norms.

19   <u>Id.</u> at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient

20   performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional

21   errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.  A reasonable

22   probability is a probability sufficient to undermine confidence in the outcome.  <u>Id.</u>

23   The state appellate court rejected this claim.  (Resp. Ex. E, Appendix A, p. 15-18.)

24   Specifically, the state court determined that there was no reasonable probability of a different

25   outcome.  (<u>Id.</u> at 17-18).

26        Even if we were to agree that an objection on the grounds of relevance would
    have been well taken, we do not find a reasonable probability of a different

27        result.  Whether or not appellant was "faithful or anything" to [the victim], he
    was married to someone else throughout their relationship and she was dating

28        John Lopez when she became pregnant with one of appellant's daughters.

1
2
3
4
5
6
7
8
9

Her testimony concerning having discovered the photographs "later" added little if anything to what was clearly established by other evidence as a very troubled, abusive relationship.  Furthermore, to the extent that this case came down to a credibility contest, the contest was between every single witness including the police versus appellant.  Appellant's defense was that 1) John Lopez attacked him with a screwdriver when appellant came to return [the victim's] drivers license, and 2) that John Lopez, while trying to stab appellant, somehow stabbed [the victim] 18 times when she intervened on appellant's behalf.  The evidence of [the victim's] significant, multiple injuries, as shown in the photographs introduced at trial, is simply irreconcilable with the explanation of their accidental infliction in both appellant's statement to Wellman at the hospital and appellant's testimony at trial.  Given the nature of properly admitted evidence concerning appellant's relationship with [the victim], and the implausibility of appellant's defense, it is not reasonably probable that an outcome more favorable to appellant would have resulted from the exclusion of evidence that at some point [the victim] discovered photographs of appellant with other women that tended to show that he had been unfaithful to her.

10

(Id.)

11
12
13
14
15
16
17

Based on the persuasive reasoning of the state appellate court and a review of the record, the court concludes that petitioner fails to demonstrate prejudice from his claim.  See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.").  Accordingly, the state appellate court's decision was not contrary to, or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

18

**CONCLUSION**

19
20

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk shall enter judgment for respondent and close the file.

21
22
23

IT IS SO ORDERED.

Dated:   12/22/08

*Ronald M. Whyte*

RONALD M. WHYTE
United States District Judge

24
25
26
27
28